# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Anita Keeley,                                    Civil No. 08-276 (PAM/AJB)

          Plaintiff,

v.                                               **Report and Recommendation on the
                                                 Parties' Cross Motions
                                                 for Summary Judgment**

Michael J. Astrue, Commissioner of
Social Security,

          Defendant.
_____

Lionel H. Peabody, Esq., for Plaintiff, Michelle Weaver.

Frank J. McGill, Jr., Acting United States Attorney and Lonnie F. Bryan, Assistant United States Attorney, for Defendant, the Commissioner of Social Security.
_____

## Introduction

       Anita Keeley ("Plaintiff") disputes the unfavorable decision of the Commissioner of the

Social Security Agency ("Commissioner") denying her application for a period of disability,

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  This matter

is before the Court, United States Magistrate Judge Arthur J. Boylan, for a report and

recommendation to the District Court on the parties' cross motions for summary judgment.  See

28 U.S.C. § 636 (b)(1) and Local Rule 72.1.  This Court has jurisdiction under the Social

Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3).  Based on the reasoning set forth below, this

Court **recommends** that the Commissioner's Motion for Summary Judgment [Docket No. 15] be

**granted** and that Plaintiff's Motion for Summary Judgment [Docket No. 9] be **denied.**

## Procedural History

Plaintiff filed an application for a Period of Disability, DIB, and SSI. See Pl.'s Mem. 1 [Docket No. 10]. She alleged onset of disability on October 1, 2003, due to back pain, lumbar disc disease, Meniere's disease, and tendinitis in the left hand (Tr. 15, 96). Her application was initially denied on May 6, 2005, and upon reconsideration on September 8, 2005 (Tr. 15). A hearing was held on January 10, 2007, before Administrative Law Judge Michael D. Quayle ("ALJ") per Plaintiff's request (Tr. 344-71). On March 23, 2007, the ALJ issued an unfavorable opinion against Plaintiff's disability claims (Tr. 15-23). On December 19, 2007, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner (Tr. 6). See 20 C.F.R. §§ 404.981, 416.1481. On January 30, 2008, Plaintiff sought review from this Court. The parties thereafter filed cross motions for summary judgment.

**Factual Background and Medical History**

*Factual Background*

Plaintiff was born on April 4, 1964, and at the time of the ALJ's decision, was 42 years old (Tr. 22). She completed a high school education (Tr. 22). At the time of the hearing in front of the ALJ, Plaintiff was single with two minor children-age ten and twelve (Tr. 347). She also lived with her eldest son, mother, and brother (Tr. 348).

Plaintiff noted that her most recent employment was in 2005 wherein she completed data entry for Amsoil (Tr. 349). Said employment only lasted three weeks because Plaintiff missed work several days due to back pain, migraines, and dizziness issues (Tr. 349, 362). Plaintiff also worked as a secretary/receptionist at Woodland Hills Academy for a week in 2004 through a

temporary employment service company, Spherion (Tr. 349, 357).[1]  In 2003, Plaintiff worked for

McDonald's as a manager (Tr. 350, 368).  That same year Plaintiff also worked at a casino, but

was let go shortly thereafter (Tr. 350).

Plaintiff indicated that the majority of her pain was located in the tailbone area and left

hip (Tr. 358-59).  At times the pain radiated up the middle of the spine (Tr. 359).  In terms of

severity, Plaintiff claimed that she even had difficulty getting on and off furniture (Tr. 359).  On

occasion, she also needed assistance with walking around (Tr. 359).  Her back issues negatively

affected her ability to cook and do laundry (Tr. 359).  Plaintiff testified that at most she could

stand for one hour at a time (Tr. 359).

Because of her Meniere's disease, it was recommended that Plaintiff not be allowed to

drive (Tr. 360).  Plaintiff stated that she would have minor episodes of dizziness once or twice a

month (Tr. 361).  Every so often she would experience more severe dizzy spells lasting over a

month (Tr. 361).

Plaintiff later testified that at the time her injuries became severe she weighed around

135 pounds (Tr. 362).  At the time of the hearing, Plaintiff weighed 220 pounds (Tr. 362).

Plaintiff informed the ALJ that she was on a waiting list for gastric bypass surgery (Tr. 358).

### *Medical History*

In early 2000, Plaintiff was treated for problems with her left hand (tenosynovitis[2] and a

fracture of the fifth metacarpal)(Tr. 235-36, 238-41, 268).

---

[1] Plaintiff indicated that the reason she was only there for a week was due to illness (Tr. 357).

[2] Inflammation of the fluid-filled sheath that surrounds a tendon. Stedman's Medical Dictionary 1946 (28th ed. 2006)(hereinafter "SMD").

3

On November 2, 2000, Plaintiff was given an epidural steroid injection (Tr. 252).

In December 2000, Plaintiff was diagnosed with L5-S1 herniated disc with S-1 nerve root impingement (Tr. 250-51).

Plaintiff underwent left L5-S1 diskectomy in January 2001 (Tr. 254).  The operative findings stated the dissection was carried out to what was thought to be the L5 area, but turned out to be the S1 spinous process area (Tr. 255).  Diskectomy was performed after freeing up the impinged nerve root (Tr. 255).  Plaintiff tolerated the procedure well (Tr. 255-56).

On January 24, 2001, the surgeon noted that Plaintiff was doing much better (Tr. 265).  She had no leg pain and her back pain decreased to a four out of ten in terms of pain (Tr. 265).  The record stated that Plaintiff could return to work in one week after working half time for a month and then full time for two months with no lifting the first month and lifting of no more than 25 pounds the second month (Tr. 265).

On March 1, 2001, Plaintiff returned to the surgeon with some back and leg pain (Tr. 265).  Plaintiff had been doing well until she returned to work (Tr. 265).  She also indicated new pain in her left arm/shoulder/neck (Tr. 265).  After examining Plaintiff, the surgeon opined that she had some residual post-operative symptoms related to the L5-S1 discectomy and possibly impingement syndrome of the left shoulder due to the surgery (Tr. 264).  Plaintiff was then given a cortisone injection for her left shoulder (Tr. 264).

On March 29, 2001, Plaintiff indicated that her left shoulder pain had resolved with the cortisone shot and exercise (Tr. 264).  There were also no reported problems with her back or legs (Tr. 264).  Plaintiff was to return to work on April 2, 2001, with permanent restriction to lifting no more than 25 pounds (Tr. 264).

On May 28, 2001, Plaintiff was treated at the emergency room (Tr. 270).  Plaintiff had been experiencing onsets of light-headedness and dizziness over the past five days (Tr. 270). She continued to have spinning vertigo when she changed positions, such as lying down or moving her head (Tr. 270).  Plaintiff was prescribed Antivert[3] and it was recommended that Plaintiff take off work for three days (Tr. 271).

That same day,[4] a Walk-In Care Report noted that Plaintiff had started back to work recently, but that she was still experiencing severe back pain and wanted a work release (Tr. 272).  She also complained of a pins and needle sensation in her legs (Tr. 272).   The record indicates that Plaintiff was an "alert woman who move[d] quite gingerly and frequently [made] painful types of noises" (Tr. 272).  An examination of her back revealed tenderness in the lumbar area (Tr. 272).  There was no evidence of swelling or discoloration (Tr. 272).  Straight leg raising was limited to 30 degrees (Tr. 272).  Plaintiff was thereafter given an injection of Toradol[5] and a prescription for Ultram[6] (Tr. 272).  The record also noted that: "It [was] explained to her that we are not the people to make the decision regarding her excuse from work or her suitability for return to work" (Tr. 272).

---

[3] An antihistamine prescribed for the management of nausea, vomiting, and dizziness associated with motion sickness. Physician's Desk Reference 45 (8th ed. 2000)(hereinafter "PDR").  Antivert may also be prescribed for the management of vertigo. Id.

[4] Plaintiff's counsel notes that the date of this report may be incorrect as the copy they received shows that said report was dictated on June 7, 2001. See Pl.'s Mem. 4, n. 1.

[5] Non-steroidal anti-inflamamatory used to relieve moderately severe, acute pain. PDR at 687.

[6] Prescribed to relieve moderate to moderately severe pain (Tr. 707).

In June 2003, Plaintiff went to Urgent Care at the Denfield Medical Center for episodes of intermittent tinnitus[7] and lightheadedness over the past two months (Tr. 339).  She was also experiencing fatigue and the occasional headache with ear pain when feeling lightheaded (Tr. 339).  Plaintiff was prescribed Flonase[8] (Tr. 339).

On July 16, 2003, Plaintiff was again seen at Urgent Care at the Denfield Medical Center (Tr. 341).  She stated that she had dizzy spells for three years (Tr. 341).  Flonase did not help reduce said spells (Tr. 341).  That morning she almost fell in the shower during an episode of dizziness (Tr. 341).  She was thereafter prescribed Meclizine[9] (Tr. 341).

On August 4, 2003, Plaintiff saw Dr. Ed Crisostomo, a neurologist, regarding her issues with lightheadedness (Tr. 273-74).  His impression was that she likely had benign positional vertigo; benign recurrent episodes of lightheadedness; muscle contraction headaches; and vascular headaches (Tr. 274).  He recommended an MRI of the brain and that Plaintiff see an ENT (Ear, Nose, Throat) specialist to rule out the very remote possibility of Meniere's disease (Tr. 274).  The MRI of the brain on August 8, 2003, showed normal function (Tr. 275).

Plaintiff saw David M. Choquette, M.D., at Northland ENT on August 27, 2003 (Tr. 276).  The record noted that Plaintiff had been experiencing severe episodes of vertigo lasting between one and two days for many months (Tr. 276).  These spells caused nausea, tinnitus, and diminished hearing (Tr. 276).  Plaintiff also had hypertension and diabetes (Tr. 276).  Dr.

---

[7] Perceived ringing in the ear in the absence of corresponding external sound. SMD at 1992.

[8] Steroid medication used to relieve inflammation within the nasal passages. PDR at 281.

[9] Similar to Antivert. PDR at 391.

6

Choquette diagnosed Plaintiff with Meniere's disease (Tr. 276).  He prescribed

Hydrochlorothiazide[10] and Allegra,[11] and Meclizine as needed (Tr. 276).

In November 2003, Plaintiff saw Dr. Peterson at the Denfield Medical Center for back

pain (Tr. 203).  For about the first year after her back surgery Plaintiff was doing well (Tr. 203).

Over the last year, Dr. Peterson noted that Plaintiff was experiencing more back pain (Tr. 203).

Plaintiff was taking Tylenol[12] for the pain, and Flexeril no longer eased her pain (Tr. 203).  She

was not interested in physical therapy (Tr. 203).  Spine films showed narrowing of L5-S1 with

spur formation suggesting degeneration of the disc (Tr. 206).

On November 24, 2003, Dr. Quinn Carmichael examined Plaintiff (Tr. 205).  An MRI of

the lumbar spine showed loss of disc signal, disc space narrowing, and end plate edema at L5-S1

(Tr. 205).  The conclusion was no evidence for recurrent disc and no abnormal soft tissue

structure to suggest excessive scar tissue at L5-S1 (Tr. 205).

A physical therapy evaluation in February 2004 indicated that Plaintiff's lower back pain

had not decreased since the surgery (Tr. 175).  The record also noted, however, that Plaintiff

perceived a 50% improvement in her condition over the 6-8 physical therapy visits  (Tr. 175,

178).  Plaintiff was diagnosed with myofascial tightness and general gluteal hypomobility

secondary to compensatory pattern from leg length discrepancy (Tr. 178).

---

[10] Used in the treatment of high blood pressure and other conditions that require the elimination of excess fluid (water) from the body. PDR at 310.

[11] Relieves the itchy, runny nose, sneezing, and itchy, red, watery eyes that come with hay fever. PDR at 23.

[12] Fever and pain medication that is widely used to relieve simple headaches and muscle aches; the minor aches and pains associated with the common cold; backache; toothache; minor pain of arthritis; and menstrual cramps. PDR at 703.

Plaintiff was discharged from physical therapy in March 2004 (Tr. 172).  The therapy discharge summary noted that the goals of therapy had been met (Tr. 172).  Subjectively, Plaintiff reported a 25% improvement in walking and mobility, although the pain remained the same (Tr. 172).  Objectively, the therapist noted decreased limping and increased cadence (Tr. 172).  It was also recommended that Plaintiff see a physical therapist once a month for another three months (Tr. 172).

Plaintiff was seen at Urgent Care on March 10, 2004, after falling down stairs at her home (Tr. 199).  She was unable to weight bear, and pain onset if she was on her feet a lot (Tr. 199).  Plaintiff was unable to fully extend or flex her right knee (Tr. 199).  X-rays revealed some degenerative changes, but no acute injury (Tr. 199).  Plaintiff was assessed with a right knee contusion (Tr. 199).

X-rays taken on March 11, 2004, indicated mild degenerative change, but no fractures, dislocations, or bony abnormalities (Tr. 204).

On April 2, 2004, Dr. Peterson reported that Plaintiff still had significant back pain with decreased range of motion (Tr. 198).  There were times where Plaintiff had to walk holding onto objects in the room (Tr. 198).  She also mentioned some bilateral leg numbness when sitting (Tr. 198).  He also noted that Plaintiff took Tylenol #3 "very rarely for pain" (Tr. 198).  Dr. Peterson recommended that Plaintiff continue physical therapy regularly and pain medication as need (Tr. 198).

On March 22, 2004, Plaintiff visited Dr. Wallerstein (Tr. 337).  Dr. Wallerstein noted that physical therapy noted increased tolerance to walking but her "pain" remained about the same (Tr. 337).  Plaintiff believed her improvement with physical therapy to be about 25% (Tr. 337).

She also demonstrated a decrease in her limp (Tr. 337).

Plaintiff was referred to Dr. Daniel Wallerstein, for physical medicine consultation on April 18, 2004 (Tr. 334-36).  Dr. Wallerstein noted that Plaintiff demonstrated mild pain behavior (Tr. 335).  She was tender to the touch over the greater trochanter bilaterally, left iliac crest, and superior lateral buttock area (Tr. 335).  Bilateral trunk excursion was "low normal on the right with left side bending, but excellent on the left with right side bending" (Tr. 335). Plaintiff had poor abdominal tone (Tr. 335).  Supine hip range of motion was normal, but she did complain of lateral lumbosacral tenderness (Tr. 335).  Dr. Wallerstein's impressions were: chronic intermittent low back pain; myofascial pain of the trunk and hip girdle contributing to symptoms; status post L5-S1 diskectomy; trunk and girdle deconditioning; mild right lateral trochanteric bursitis; ankle pronation contributing to functioning leg length discrepancy; tobacco use; caffeine abuse; and obesity (Tr. 335).  He recommended that Plaintiff: use supportive footwear; go to physical therapy with specific trunk and hip girdle stretching and strengthening; massage; lose weight to minimize excessive strain, wear, and tear on joints; consider sleep medication; and stop smoking (Tr. 335).

On May 10, 2004, Dr. Peterson noted that Plaintiff continued to have significant pain in her back and decreased range of motion (Tr. 196).  Plaintiff indicated that she wanted to take a job as a bank teller four hours per day, three days per week (Tr. 196-97).  Dr. Peterson also stated that he wanted to talk to Dr. Wallerstein to clarify he work restrictions (Tr. 196-97).

On May 19, 2004, Plaintiff again saw Dr. Wallerstein (Tr. 338).  Plaintiff indicated that she was hoping to find employment for about 30 hours per week (Tr. 338).  Dr. Wallerstein noted Plaintiff increased tolerance for walking, lifting, etc. (Tr. 338).  The notes also noted,

however, that Plaintiff had been less compliant with her physical therapy over the past several weeks (Tr. 338).

Dr. Wallerstein completed a form for Plaintiff on June 4, 2004, diagnosing her with chronic back pain (Tr. 167). He stated that this condition would last more than 30 days (Tr. 167). Dr. Wallerstein noted a permanent physical restriction of lifting more than 30 pounds (Tr. 167). He limited her to 4-6 hours of work per day, 2-3 days per week (Tr. 167). Dr. Wallerstein also indicated that Plaintiff was not following through with her physical therapy (Tr. 167, 169).

On December 1, 2004, Plaintiff saw Dr. A. Neil Johnson for a Social Security consultative examination (Tr. 181). Plaintiff reported back pain going into both legs (Tr. 181). On a good day she could walk three blocks (Tr. 181). She noted tendinitis in her left wrist (Tr. 181). Plaintiff took Tylenol #3 twice a day to deal with the wrist pain (Tr. 181). Plaintiff also took Meclizine for her Meniere's disease, which helped reduce the number of dizzy spells she experienced (Tr. 181). Plaintiff's social history noted that she smoked daily for 17 years (Tr. 181, 194, 199). At the time of the examination, Plaintiff weighed 172 pounds and was considered "mildly obese" (Tr. 182). Except for flexion, Plaintiff had normal range of motion for extension, right lateral flexion, left lateral flexion, right rotation, left rotation, dorsi-flexion, plantar-flexion, radial deviation, and ulnar deviation (Tr. 182-83). Plaintiff also reported decreased sensation in the lateral right calf in the area of L5 and the medial aspect of the left calf from L4 (Tr. 183). Dr. Johnson concluded that Plaintiff had low back pain with numbness of the right L5 and L4 areas (Tr. 183). X-rays showed degenerative changes at L5-S1 (Tr. 181). He opined that heavy lifting, prolonged standing, and walking would be impaired by said condition (Tr. 183). He also diagnosed left wrist discomfort wherein her grip was "somewhat decreased"

10

and a history of Meniere's disease which caused dizzy spells about once every two months (Tr.

183).

On December 7, 2004, Dr. Alan Cuddard, a state agency physician, reviewed and

assigned Plaintiff certain exertional limitations: lift twenty pounds occasionally; ten pounds

frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an

eight-hour workday; and push and/or pull unlimited (Tr. 186).  With respect to postural

limitations, Plaintiff could climb frequently, and balance, stoop, kneel, crouch, and crawl

occasionally (Tr. 187).  He did not indicate any manipulative, visual, communicative, or

environmental limitations for Plaintiff (Tr. 188-89).  Dr. Cuddard also noted the same physical

impairments that Dr. Johnson diagnosed several days earlier (Tr. 186-87).

On April 20, 2005, Plaintiff saw Dr. Johnson again for a consultative examination (Tr.

207-10).  Plaintiff rated her back pain as five out of ten, but it increased to eight or nine out of

ten with activity (Tr. 209).  Plaintiff reported left wrist discomfort, but Dr. Johnson noted full

range of motion (Tr. 209).  She also stated that she had been losing jobs because of her

Meniere's disease (Tr. 210).  All of her range of motion tests fell within the "normal" ranges (Tr.

208).  Dr. Johnson noted that Plaintiff had mild difficulty getting on and off the examination

table, she could not tandem walk unless she held onto the table, severe difficulty squatting, and

could not hop (Tr. 208).  Record indicated that Plaintiff had recently quit smoking (Tr. 207).

She weighed 189 pounds (Tr. 208).

On April 27, 2005, a non-examining DDS reviewer, Dr. Daniel Larson, concluded that

Plaintiff had the RFC to occasionally lift ten pounds; frequently lift ten pounds; stand and/or

walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday;

and push and/or pull unlimited (Tr. 220). This conclusion was based on several facts: Plaintiff's analgic small stepped gait with a mild left sided limp; tenderness across lumbar spine; straight leg raising to 45 degrees bilaterally producing back pain; mild crepitus of both knees; mild difficulty getting on and off the exam table; severe difficulty squatting (Tr. 220). Discomfort, but full range of motion, was noted in Plaintiff's left wrist (Tr. 220). Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (Tr. 221-23). Plaintiff's subjective complaints of pain were considered in her RFC (Tr. 224).

On May 3, 2005, Plaintiff saw Dr. Peterson for her back pain, *inter alia* (Tr. 214). Plaintiff stated that physical therapy did not help and that she was unable to take NSAIDs (non-steroidal anti-inflammatories) because of the side effects (Tr. 214). Plaintiff was assessed with mechanical low back pain with markedly decreased range of motion with no improvement over the last year (Tr. 214-15). Dr. Peterson then stated, "I am not sure what else to offer her at this point. She has failed all conservative measures and is not a surgical candidate. I did write a note that her condition is stable, and she is apparently going to apply for disability after being turned down the first time" (Tr. 214).

Dr. Peterson then completed a medical opinion form for Social Services on July 21, 2005, diagnosing Plaintiff with mechanical low back pain (Tr. 218). Dr. Peterson opined that said condition would last more than 30 days and that Plaintiff would not be able to perform any employment in the foreseeable future (Tr. 218). He also noted that Plaintiff was not a surgical candidate and that she failed physical therapy treatment (Tr. 218).

On September 2, 2005, the findings of Dr. Larson from April 27th were affirmed on Request for Reconsideration (Tr. 228-29).

On September 29, 2005, Plaintiff visited Dr. Peterson for issues with numbness in both her legs (Tr. 292).  She described a twitching sensation in both lower extremities before falling asleep (Tr. 292).  This sensation often kept her from sleeping (Tr. 292).  At this time, Plaintiff weighed 204 pounds (Tr. 292).  Testing showed: normal lower extremities; good distal pulses; good reflexes at the knees and ankles; fairly good strength; decreased sensation to sharp and to light touch in the lower extremities; and right foot pain (Tr. 292).  Plaintiff was prescribed Lorazepam[13] to help her sleep (Tr. 292).

On October 31, 2005, Plaintiff had an MRI on her lumbosacral spine (Tr. 248).  Testing revealed L5-S1 degenerative disc changes with left-sided disc prolapse with some superior extrusion (Tr. 248).  The radiologist also believed that there was possible impingement on the exiting S1 nerve root, but not the L5 nerve root (Tr. 248).

Dr. Peterson completed a form for Duluth Work Force Development on December 12, 2005, describing Plaintiff's physical condition (Tr. 279).  Dr. Peterson diagnosed Plaintiff with lumbar disc disease and severely limited range of motion of the lower back (Tr. 279).  She was unable to stand or sit for extended periods (Tr. 279).  Plaintiff failed physical therapy, had been evaluated by physical medicine and rehab, and had no response to exercise and NSAIDs (Tr. 279).  Dr. Peterson stated that there was "not much else to do" (Tr. 279).  She was unable to work in any capacity (Tr. 279).  In his opinion, Plaintiff should apply for disability benefits (Tr. 279).

_____

[13] Used in the treatment of anxiety disorders and for short-term relief of symptoms of anxiety. PDR at 60.

On December 8, 2005, Plaintiff had electromyographic ("EMG") and nerve conduction testing done for her lower extremity pain and perceived hip pain (Tr. 308).  Upon examination, Plaintiff's strength appeared to be normal for hip flexors, quadriceps, hamstrings, and the dorsi and plantar flexors of the feet (Tr. 308).  Both the nerve conduction and EMG studies came back normal (Tr. 308).

Plaintiff again saw Dr. Peterson on December 15, 2005, for back pain (Tr. 285).  Upon examination, she had limited range of motion of her lower back (Tr. 285).  Dr. Peterson "encouraged her to continue her pursuit of disability" as he "doubt[ed] at this point that she could hold a job" (Tr. 285).  He diagnosed Plaintiff with mechanical low back pain; history of lumbar disc disease; sciatica with nerve conduction study, not supporting a neuropathic process (Tr. 285).

A dietician noted in January 2006 that Plaintiff was 80 pounds heavier than she wanted to be (Tr. 305).  Due to her medical problems, Plaintiff was very restricted in activities and exercise on a daily basis (Tr. 306).  Her balance was poor so walking was not an option (Tr. 306).  The dietician recommended that Plaintiff try pool therapy (Tr. 306).

On February 13, 2006, Plaintiff had a physical therapy evaluation with Ronald D. Winans (Tr. 303-04).  Plaintiff complained of back pain rated a seven on a scale of ten that increased with prolonged sitting, walking, and standing (Tr. 303).  Medication did help reduce the pain (Tr. 303).  She had difficulty falling asleep, driving, housework, yard work, job duties, stair climbing, recreational activities, dressing, reaching, sitting, lifting, bending, and walking (Tr. 303).  Objective testing revealed asymmetries with walking that increased with longer distances (Tr. 303).  Range of motion was significantly limited (Tr. 303).  Sitting posture was fair with an

14

increased lordosis in a standing posture (Tr. 303).  Plaintiff also had weak hip strength (Tr. 303).

Plaintiff assessment showed: significant decreased conditioning; overweight; decreased trunk

mobility and flexibility with low back pain; lower extremity referred pain secondary to

decreased strength core and pelvic stability (Tr. 304).  She was placed on treatment plan,

including pool therapy, to increase her strength, condition, posture, body mechanics, core, and

pelvic stability (Tr. 304).  Plaintiff would complete physical therapy two days per week for three

to four weeks (Tr. 304).

A follow-up appointment was scheduled with Mr. Winans on April 13, 2006 (Tr. 301).

With pool therapy, Plaintiff stated that she was now able to walk the stairs on a reciprocal

motion (Tr. 301).  Climbing stairs were still difficult, but she was making improvement (Tr.

301).  The record also noted that Plaintiff wanted to advance to a home exercise program with

walking five to six times daily for about two to four blocks (Tr. 301).  Plaintiff's pain had

reduced to at least a five on a scale of ten, and her trunk of range motion had increased to at least

50% (Tr. 302).  Winans recommended that Plaintiff continue with the pool therapy (Tr. 302).

On June 5, 2006, Plaintiff visited with Dr. Peterson to discuss the possibility of having

bariatric surgery for weight loss (Tr. 324).  At that time, Plaintiff weighed 225 pounds (Tr. 324).

All other attempts to lose weight (dietary counseling, pool therapy, etc.) were unsuccessful (Tr.

324).

Plaintiff saw Dr. Peterson on October 3, 2006, for a follow-up visit concerning her leg

and foot pain (Tr. 318).  Medical notes indicated that she was having a significant amount of

bilateral lower extremity pain on both sides, left more so than the right (Tr. 318).  Plaintiff stated

that she would like a handicapped parking sticker since she could not walk more than 200 feet

15

without stopping to rest (Tr. 318).  She at times used a cane to help her walk (Tr. 318).  The

record also noted that she was pursuing the possibility of gastric bypass surgery and going

through the screening process (Tr. 318).  Objective examination showed low back tenderness,

especially on the left side, even to minimal palpation, as well as decreased strength in the

hamstrings and quadriceps (Tr. 318).  Plaintiff was diagnosed with chronic low back pain,

possible fibromyalgia, obesity, and Meniere's disease (Tr. 318).

On October 23, 2006, Plaintiff presented worsening lower back pain (Tr. 311).  Her

Lortab prescription was no longer helping with the pain (Tr. 311).  Objective observations noted

lower back tenderness to palpation over the lower lumbar region (Tr. 311).  Straight leg raise

was negative on the right, but it did cause a small amount of pain on the right side of her lower

back that did not radiate into her right leg (Tr. 311).  X-rays showed moderate narrowing of the

disc at L4-5 with subchondral sclerosis and moderate osteophyte formation (Tr. 313).  The

results of this examination were similar to the examination from November 20, 2003 (Tr. 313).

On October 26, 2006, Plaintiff followed-up with Dr. Peterson for her low back pain (Tr.

310).  X-rays were negative and her back examination was unremarkable (Tr. 310).  Objective

analysis noted that Plaintiff had extreme difficulty moving about the exam table (Tr. 310).  Her

reflexes in the lower extremities were equal and symmetrical (Tr. 310).  Straight leg testing was

positive at about 20 degrees causing increased back pain (Tr. 310).  The assessment was acute on

chronic low back pain (Tr. 310).  Her Percocet[14] prescription was refilled and she was referred

for physical therapy (Tr. 310).

---

[14] A narcotic analgesic used to treat moderate to moderately severe pain.  PDR at 310.

**Testimony at Administrative Hearing**

*Plaintiff's Relevant Testimony*[15]

*Vocational Expert's Relevant Testimony*

Mary Harris, a vocational expert, testified as to Plaintiff's ability to work (Tr. 367).  The

ALJ constructed a hypothetical question for Ms. Harris (Tr. 367):

> [W]e've got a basic sedentary RFC here...ten pounds occasionally, ten pounds frequently,
> stand two [hours], sit six [hours], push/pull[] unlimited.  Type written body of the report
> indicates claimant works with an ant[a]lgic small step gait, mild left sided limp.  And her
> palpitation across lumbar spine, but no spasms, straight leg raising was the 45 degrees bi-
> laterally and includes back pain.  Mild crevice of both knees.  Mild difficulty getting on
> and off exam table.  Could not s[tan]d or walk unless hold[ing] on [to] table.  Severe
> difficulty squatting.  Cannot hop.  Full use of hands is noted.  Some discomfort on motion
> of left wrist.  Mild crevice of both wrists.  Discomfort, but fill motion of left wrist.
> Indicates weight...189 pounds.  Problems no posturals, no manipulative, no visual
> limitations...they did not check hazardous machinery and heights, but obviously with the
> Meniere's disease, [Plaintiff is] going to need to avoid all exposure to hazards and
> machinery, but particularly heights.  If I had that hypothetical individual for this lady's
> age, educational background and work history experience, would there be first off, any of
> her past work available in step four, and other work at step five?

Ms. Harris response was that all her past employment exceeded the hypothetical's sedentary

requirements (Tr. 368).  She then opined that Plaintiff did have transferrable skills in data entry

and customer service (Tr. 368).  Therefore, Harris believed that receptionist and/or general

clerical work would be appropriate jobs under the ALJ's hypothetical (Tr. 368-69).  Out of the

20,000 receptionist jobs and 85,000 clerical jobs available, Ms. Harris indicated that the

hypothetical would allow for 10,000 jobs in each category (Tr. 369).

---

[15] See supra "Factual Background".

The ALJ then posed a second hypothetical to Ms. Harris based on her previous response

(Tr. 369):

> [L]imited to the extent that Dr. Wallerstein has indicated ,that [Plaintiff has] indicated
> and that her children in their letters have indicated that secondary to the pain and
> dizziness that[] she [experiences], [that she would be] unable to show up on a five day a
> week, eight hour day, 40 hour a week basis, even though her RFC would be sedentary.  If
> I add that as an additional and significant work-related limitation of functioning and
> creating a hypothetical individual number two, of her age, educational background and
> work history experience, in your opinion would that hypothetical person be able to do
> any of her past work or any of the jobs that you've cited in response to hypothetical
> number one?

Ms. Harris responded, "None, Your Honor" (Tr. 369).  She also stated that employers typically

tolerated no more than two days off per month (Tr. 369).

## The ALJ's Findings and Decision

As previously stated, on March 23, 2007, the ALJ issued his decision denying Plaintiff's

DIB and SSI claims that she was disabled (Tr. 15-23).  The ALJ followed the sequential five-

step procedure as set out in the rules.  See 20 C.F.R. §§ 404.1520(a), 416.920(a).  The Eighth

Circuit has summarized these steps as follows: (1) whether the claimant is currently engaged in

"substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that

"significantly limits the claimant's physical or mental ability to perform basic work activities";

(3) whether the claimant's impairment "meets or equals a presumptively disabling impairment

listed in the regulations (if so, the claimant is disabled without regard to age, education, and

work experience); (4) whether the claimant has the RFC to perform his or her past relevant work;

and (5) if the ALJ finds that the claimant is unable to perform the past relevant work then the

burden is on the ALJ "to prove that there are other jobs in the national economy that the claimant

can perform." Fines v. Apfel, 149 F.3d 893, 894-95 (8th Cir. 1998).

The ALJ determined that Plaintiff met the requirements for the first two steps of the disability determination procedure. The ALJ found that Plaintiff had not engaged in substantial gainful activity (Tr. 17). The ALJ noted that Plaintiff had unsuccessfully attempted to return to work several times (Tr. 17). At step two, the ALJ found that Plaintiff had several severe impairments that caused significant limitations in the her ability to perform basic work activities: degenerative disc disease of the lumbar spine, degenerative joint disease of the right knee, and Meniere's disease (Tr. 17).

At step three, the ALJ determined that Plaintiff's impairments did not meet or equal one of the listed presumptively disabling impairments as of October 15, 2003 (Tr. 18). Her musculoskeletal impairments did not limit her mobility to the degree required by the listings (Tr. 18). Also, the dizziness associated with the Meniere's disease was not accompanied by episodes in the frequency and severity required by the listings to disturb labyrinthine-vestibular function (Tr. 18).

At step four, the ALJ determined that Plaintiff had the following RFC: (1) to perform sedentary work; (2) lift and/or carry and push and/or pull no more than ten pounds at any time; (3) stand and/or walk two hours per eight-hour day with normal breaks; (4) sitting six hours per eight-hour day with normal breaks; (5) no exposure to heights; and (6) no other exertional or non-exertional limitations (Tr. 18).

The ALJ held that Plaintiff was unable to perform any past relevant work (i.e., fast food manager, production worker, and casino cashier)(Tr. 22). However, considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that Plaintiff was able to perform a

significant number of jobs in the national economy (Tr. 22).  Accordingly, the ALJ found that

Plaintiff was not disabled (Tr. 23).

**Standard of Review**

Review by this Court is limited to a determination of whether the decision of the ALJ is

supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Murphy v.

Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402

U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

"The substantial evidence test employed in reviewing administrative findings is more than a

mere search of the record for evidence supporting the [Commissioner's] findings."  Gavin v.

Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).  "'Substantial evidence on the record as a whole,'

. . . requires a more scrutinizing analysis."  Id.

In reviewing the record for substantial evidence, the Court may not substitute its own

judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court

should not reverse the Commissioner's finding merely because evidence may exist to support the

opposite conclusion.  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3

F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would

support the opposite finding).  Instead, the Court must consider "the weight of the evidence in

the record and apply a balancing test to evidence which is contradictory."  Gavin, 811 F.2d at

1199.

The claimant bears the burden of proving his or her entitlement to disability insurance

benefits under the Social Security Act.  See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v.

Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial gainful activity. Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

**Discussion**

Plaintiff advances four main arguments that the ALJ erred in concluding that Plaintiff was not disabled and entitled to social security benefits: (1) the ALJ did not give proper weight to the opinions of her treating physicians; (2) the ALJ's credibility determination/finding was contrary to the law and the record as a whole; (3) the ALJ's RFC finding did not incorporate all of the limitations shown by the record; and (4) the ALJ failed to fully and fairly develop the record.

### 1.  The ALJ did not give proper weight to the opinions of her treating physicians

Plaintiff argues that the ALJ erred by not accepting the opinions of Dr. Peterson and Dr. Wallerstein regarding her alleged disability and inability to do full-time work. See Pl.'s Mem. 20.  Dr. Peterson, her primary physician, repeatedly opined that Plaintiff was disabled and advised her to apply for disability benefits (Tr. 203, 218, 279, 285).  Dr. Wallerstein opined that Plaintiff was incapable of more than part-time employment (Tr. 167).  Furthermore, Ms. Harris, the vocational expert, testified that under the limitations given by Dr. Wallerstein that there were no jobs available that Plaintiff could perform (Tr. 369).

The ALJ stated that the medical records showed "the existence of impairments that limit the claimant's functional capacity, but not to the extent that she [was] unable to perform any full time work" (Tr. 21).  Dr. Wallerstein's opinions were "diminished by [Plaintiff's] failure to

complete therapy, the lack of supporting objective evidence, and the inconsistencies in the claimant's allegations, which served as the major basis of the doctor's opinion" (Tr. 21).  Dr. Peterson's opinions were not given great weight "as [they gave] credence to the claimant's lack of progress with exercise, but the record clearly show[ed] that when she participated, she improved" (Tr. 21).

It is true that medical sources can opine as to the hours a claimant can work, and that physicians regularly make such assessments. Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).  In fact, medical opinions on how much work a claimant can do are not only allowed, but encouraged. Id.  It is equally true that an opinion from a medical source regarding a claimant's ability to work is not necessarily determinative of disability (see 20 C.F.R. §§ 404.1527(e), 416.927(e); Cruze v. Chater. 85 F.3d 1320, 1325 (8th Cir. 1996)(statements of disability are "not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner]").  Opinions on issues reserved to the Commissioner are not entitled to any special significance. 20 C.F.R. §§ 404.1527(e), 416.927(e); SSR 96-5p.

The Court finds that the ALJ gave good reasons,[16] supported by substantial evidence in the record, for placing little weight on the medical opinions of Dr. Wallerstein and Dr. Peterson regarding her ability to perform full-time employment.  Both Dr. Wallerstein and Dr. Peterson noted Plaintiff's failure to comply with physical therapy (Tr. 167, 169, 203, 214, 279, 338).  Plaintiff's compliance with recommended physical therapy was a significant factor to consider in this case because the record notes marked improvement in Plaintiff's mobility when she

---

[16] Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must "always give good reasons" for the particular weight given to a treating physician's evaluation. 20 C.F.R. § 404.1527(d)(2).

followed her physical treatment plan (Tr. 175, 178, 301, 337-338).  While it is true that Dr.

Wallerstein and Dr. Peterson never indicated that physical therapy would restore her ability to

perform full-time employment, such a determination is ultimately reserved (as stated above) for

the Commissioner.

Plaintiff also agrees that physical therapy did improve her mobility, but asserts that her

pain remained (Tr. 172).  See also Pl.'s Mem. 22.  The Court, however, would concur with the

ALJ that Plaintiff's subjective complaints of pain were often inconsistent with objective medical

testing and were therefore not entirely credible (Tr. 172, 182-83, 208-09, 220, 292, 308, 310,

335, 337).  For example, that same day that Plaintiff indicated that she continued to have pain

despite, objective testing revealed decreased limping and increased walking cadence (Tr. 172).

The Court would also note inconsistencies in the medical of Dr. Wallerstein and Dr.

Peterson.  With respect to Dr. Wallerstein, in April 2004 he noted significant improvement and

increased tolerance in Plaintiff's condition (Tr. 337-38), but in June 2004 he restricted her to

part-time work (Tr. 167).  As for Dr. Peterson he stated on May 3, 2005, "I am not sure what else

to offer her at this point.  She has failed all conservative measures and is not a surgical candidate.

I did write a note that her condition is stable, and she is apparently going to apply for disability

after being turned down the first time" (Tr. 214)(emphasis added).  However, on July 21, 2005,

Dr. Peterson opined that Plaintiff would not be able to perform any employment despite her

"stable" condition (Tr. 218).

Finally, Plaintiff argues that the ALJ fails to cite any examining or treating source

conflicting with Dr. Wallestein's or Dr. Peterson's opinion that she is capable of no more than

part-time employment. See Pl.'s Mem. 21-23.  Nevertheless, both the ALJ and Dr. Larson (with

whom the ALJ relied upon) took into full consideration the physical impairments diagnosed by Dr. Wallerstein and Dr. Peterson, but found that said impairments were not so severe that they hindered Plaintiff from performing full-time work (Tr. 19-22, 220).  In fact, when Plaintiff initially visited with Dr. Wallerstein, it was recommended that she use supportive footwear, prescribed physical therapy, and recommended myofascial massage (Tr. 335).  A similar argument regarding the severity of Plaintiff's pain can also be made for Dr. Peterson's records wherein he opined that Plaintiff was not a surgery candidate, and he recommended pain medication that is normally used to treat "mild to moderately severe" pain.  The Court would agree with Defendant's contention that such recommendations run afoul of "someone who needed significant restrictions." See Def.'s Mem. 14 [Docket No. 16].   Thus, for all the foregoing reasons the Court holds that the ALJ did not err in placing little weight on the work-related opinions of Dr. Wallerstein and Dr. Peterson, and therein restricting Plaintiff's RFC to sedentary work.

**2.  The ALJ's credibility determination/finding was contrary to the law and the record as a whole**

Plaintiff asserts that the ALJ was not medically qualified to assert that the objective record did not support a finding of disability. See Pl.'s Mem. 24.  This argument lacks merit as the discussion above states that the ultimate determination of disability is charged to the ALJ and the Commissioner.  As Defendant contends, "[I]f such a determination were left to a physician, then there would be no need for [ALJs] to adjudicate these cases." See Def.'s Mem. 17.  Based on objective medical records, the ALJ did find that Plaintiff had severe impairments: degenerative disc disease of the lumbar spine, degenerative joint disease of the right knee, and

Meniere's disease (Tr. 17).  However, the ALJ proffered valid reasons supported by substantial evidence in the record to question the severity of said impairments and the effects they would have on her ability to work.  For example, while Plaintiff can refer to objective evidence noting the severity of her Meniere's disease, the record lacks any medical evidence that would support her claim that this impairment would cause her to be absent from work more than two days each month.  Moreover, the fact that Tylenol #3 and Lortab were prescribed for her pain is further support of the severity of her impairments (see Pl.'s Mem. 25), but the medical record would show evidence to the contrary in that Plaintiff either did not take said medications (Tr. 318) or that said medication was actually helping to reduce her pain when taken regularly (Tr 203).  The Court would also question the severity of Plaintiff's subjective pain complaints as the medication prescribed to Plaintiff is used to relieve "mild to moderately severe" pain.

Plaintiff also complains that while the ALJ listed the factors he is required to consider in assessing her credibility under Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) and Social Security Rule 96-7p, the ALJ failed to consider any of those factors. Id.  This claim also fails.  While it is true that the ALJ has to consider the Polaski factors, the ALJ does not have to discuss each one of them in relation to Plaintiff, and he was permitted to discount her subjective complaints if they were "inconsistent with the evidence as a whole." Ford v. Astrue, 518 F.3d 979, 982 (8th Cir. 2008).  The ALJ is, however, tasked with detailing the reasons for discrediting the testimony ans set forth the inconsistencies found. Id.  Here, the ALJ discounted the Plaintiff's credibility as her "statements concerning the intensity, persistence, and limiting effects of [her] symptoms [were] not entirely credible" (Tr. 19).  This adverse credibility finding by the ALJ was based on a detailed comparison of Plaintiff's subjective complaints to the objective medical

evidence in the record (Tr. 19-22), and subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322.  As previously stated, the Court finds substantial evidence in the record to support the ALJ's credibility determination that Plaintiff's subjective complaints of pain were not as severe as noted considering the inconsistencies with the objective medical evidence (Tr. 172, 182-83, 208-09, 292, 308, 310, 335, 337).  Therefore, the ALJ's credibility determination/finding was not contrary to the law and the record as a whole.

### 3.  The ALJ's RFC finding did not incorporate all of the limitations shown by the record

Plaintiff contends that the ALJ erred in failing to include her need for rest on a daily basis and her inability to sustain any position for prolonged periods (Tr. 167) in the RFC finding and corresponding hypothetical question posed to the vocational expert. Id. at 26.  The Court disagrees.  First, Plaintiff fails to point to (and the Court could not find) any evidence in the record (let alone substantial evidence) suggesting that Plaintiff needed a significant amount of rest that would preclude her from performing full-time employment.

Second, a hypothetical question need only contain those limitations that are supported by the record. See Forte v. Barnhart, 377 F.3d 892, 897 (8th Cir. 2004).  Here, Dr. Peterson noted on one occasion that Plaintiff needed frequent changes in position (Tr. 167).  The ALJ discounted this limitation as there was no narrative or other medical records evidencing such a limitation (Tr. 355-56). See Onstad v. Shalala, 999 F.2d 1232, 1234-35 (8th Cir. 1993)("the hypothetical...is required to include only those impairments that the ALJ finds actually exist, and not impairments the ALJ rejects-assuming of course, that the ALJ's findings are supported by substantial evidence").   In light of the earlier finding that the ALJ did not err in placing greater

weight on the work-related opinions of Dr. Peterson, the Court finds the ALJ properly included in the RFC and hypothetical question the work-related limitations that he found credible and supported by substantial evidence in the record. See, e.g. Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004)("fact that the ALJ omitted from his hypothetical question those aspects of [claimant's] subjective complaints that the ALJ considered non-credible does not render the question faulty.").

An alternative finding could also be made that the ALJ did address Plaintiff's ability to sustain any position for prolonged periods of time in the RFC by limiting her to standing and/or walking two hours per eight-hour day with normal breaks, and sitting six hours per eight-hour day with normal breaks (Tr. 18, 367-68).  These limitations on standing and/or sitting were based on Dr. Larson's RFC assessment which (as previously mentioned) was based on the conclusions of Dr. Wallerstein and Dr. Peterson regarding Plaintiff's limitations minus the opinion that she was incapable of full-time employment (Tr. 225, 355, 367).   Thus, the ALJ's RFC finding and corresponding hypothetical question to the vocational exert did incorporate all of the credible limitations in the record.

Plaintiff also argues that the ALJ erred in not incorporating Dr. Wallerstein's limitations to part-time employment in the RFC. See Pl.'s Mem. 25.  The Court, however, agrees with Defendant that this argument simply rehashes Plaintiff's early argument that Dr. Wallerstein's employment opinions were not given more weight.  As discussed above, the ALJ gave several good reasons for declining to assign significant weight to these opinions.

### 4.  The ALJ failed to fully develop the record

The ALJ has an affirmative duty to fairly and fully develop the record. See Lewis v. Schweiker, 720 F2d 487, 489 (8th Cir. 1983).  Plaintiff asserts that the ALJ failed to make any inquiry regarding the nature and severity of Plaintiff's impairments and that all of the testimony given by Plaintiff was in response to questioning by counsel. See Pl.'s Mem. 26.

The Court, however, finds that the ALJ sufficiently developed the record concerning the nature and severity of Plaintiff's impairments.  As Defendant notes, "There is no requirement that the ALJ himself develop the record, only that the record be developed." See Def.'s Mem. 19. Plaintiff's counsel adequately questioned the claimant about her subjective pain complaints at the hearing (Tr. 359-63).  Moreover, the record is replete with medical notations indicating Plaintiff's subjective complaints of pain.

Plaintiff also contends that the ALJ failed to fully develop Plaintiff's credibility determination by not allowing her daughter to testify.  Plaintiff's counsel notified the ALJ at the hearing that Plaintiff's daughter could testify if necessary (Tr. 363).  The ALJ acknowledged that he received the letters from the daughter and at least one other family member, and that said letters were easy to read (Tr. 363-65).  The ALJ then said, "I don't really, I don't, I mean I don't, they didn't seem to think that there was any credibility problems [] when they did this RFC...I mean they didn't, I don't see any notes in there [that] would say they don't believe her..." (Tr. 365).  Plaintiff interprets this exchange to mean that there were no credibility concerns regarding Plaintiff. See Pl.'s Mem. 27.  If there were no credibility concerns then Plaintiff would be found disabled, there would be no need for further testimony, and the RFC of Dr. Wallerstein would be accepted. Id. However, that was not the case.  The ALJ later found Plaintiff's concerning the severity of her pain to not be entirely credible (Tr. 19).  Thus, Plaintiff argues that the ALJ's

failure to take evidence from the claimant's daughter amounted to a failure to fully develop the record.

The subjective testimony of the claimant, her family, and others must be considered by the ALJ, even if it is uncorroborated by objective medical evidence. <u>Bassinger v. Heckler</u>, 725 F.2d 1166, 1169 (8th Cir. 1984). Nevertheless, the ALJ is also free to disbelieve the testimony of Plaintiff, her daughter, and the letters of others. <u>Id.</u>  Here, the Court does not find the ALJ's actions under these circumstances constitutes error rising to the level of reversal or remand.  Any testimony by Plaintiff's family members (in addition to the letters that the ALJ already received) would have merely reiterated Plaintiff's own testimony regarding the severity of her impairments and supported the credibility of such subjective complaints.  However, the Court finds it hard to believe that such testimony would help resolve and/or address the inconsistencies between Plaintiff's subjective complaints and her objective medical tests.  As Defendant states, "[I]t is doubtful that any testimony from a family member, would have resolved concerns like those raised when Dr. Wallerstein noted how [Plaintiff] ha[d] stopped attending physical therapy (Tr. 167, 338), or the ALJ's concerns about how she exaggerated her complaints in October 2006, when she went to Urgent Care complaining that she could hardly move, but x-rays and a physical examination produced no findings to support such a complaint (Tr. 310)." <u>See</u> Def.'s Mem. 27. The ALJ took into consideration Plaintiff's testimony, the letters from family members, and the subjective complaints noted in the medical record and compared that evidence to the objective medical findings and properly determined, based on substantial evidence in the record, that Plaintiff's subjective complaints were "<u>not entirely</u> credible" (Tr. 19).

**Conclusion and Recommendation**

Substantial evidence in the record as a whole supports the ALJ's finding that Plaintiff's allegations of disability through Dr. Wallerstein and Dr. Peterson opinions regarding her work-related limitations were not fully credible.  The ALJ afforded the proper amount of weight to these opinions, included the necessary limitations in determining Plaintiff's RFC and formulating a hypothetical for the vocational expert, and fully developed the record in this case.  Accordingly, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment [Docket No. 15] be **GRANTED** and Plaintiff's Motion for Summary Judgment [Docket No. 9] be **DENIED**.

Dated:   February 26, 2009


  s/ Arthur J. Boylan
Arthur J. Boylan
United States Magistrate Judge

**Notice**

Pursuant to Local Rule 72.2 (b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **March 12, 2009.**